**DISTRICT OF COLUMBIA, Appellant,**

v.

**Janie SHANNON, Appellee.**

No. 95–CV–471.

District of Columbia Court of Appeals.

Argued April 3, 1997.

Decided June 26, 1997.

---

**1362**

Martin B. White, Assistant Corporation Counsel, with whom Charles F.C. Ruff, Corporation Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corporation Counsel, were on the brief, for appellant.

David P. Sutton, Washington, DC, with whom Steven M. Cooper and Douglas J. Adams, Silver Spring, MD, were on the brief, for appellee.

Before FERREN, STEADMAN, and KING, Associate Judges.

FERREN, Associate Judge:

A jury awarded Janie Shannon, individually and as next friend of her minor daughter, Terra Hughes, $550,000 to compensate her for the loss of Hughes' thumb after it was severed in an accident on a playground slide maintained by the District. On appeal, the District argues that (1) Shannon failed to establish that the District violated the appropriate standard of care, and that (2) the trial court erred by denying the District's request for special interrogatories to establish the liability of joint tortfeasors who previously had settled with Shannon, and thereby erroneously denied the District an opportunity to reduce its liability to a pro rata share of the jury's award. We affirm.

**I.**

On October 13, 1989, Terra Hughes and several other children were playing on the playground at the James Creek Dwellings, a townhouse development owned by the District of Columbia Department of Assisted Housing. The playground equipment included a sliding board, which consisted of a metal slide with two hollow metal pipes as siderails.

The slide in question came as a kit from the Miracle Lawn Company (Miracle) in 1981 or 1982 and was assembled and installed by Oaklawn Development Co. (Oaklawn) in 1982. Although Miracle, the manufacturer, specified that the ends of the pipes should remain closed with end-caps provided by Miracle, the ends of the pipes on the slide were open. Hughes caught her thumb in one of the pipes and her thumb was ripped out of her hand. Attempts to reattach the thumb failed, leaving Hughes without a functioning thumb.

Janie Shannon, individually and as Hughes' mother and next friend, brought suit against the District, Miracle, and Oaklawn. In addition, Miracle and Oaklawn filed crossclaims against the District. The District did not file any crossclaim. On January 5, 1994, approximately four months before trial, Shannon settled with Miracle and Oaklawn for $80,000 and $20,000, respectively, and continued to litigate only against the District. Miracle and Oaklawn dismissed their crossclaims against the District. The settlement contained no stipulation as to Miracle's or Oaklawn's negligence.

At trial, Shannon testified about the accident and called two doctors to testify about Hughes' treatment and the extent of her injuries. Shannon also called a vocational training expert to testify about Hughes' lost earning power as a result of her injury.

To demonstrate the existence of a dangerous condition and the District's negligence, Shannon called Elsworth T. Olds, a licensed private investigator. Olds had investigated the accident scene for Shannon five days after the accident occurred and photographed the equipment. Olds described the holes as having rust around the edges and inside. The photographs were admitted in evidence and went to the jury. Olds also reported that a handrailing was missing, so that a child sitting on the slide would grab the metal-pipe siderail, rather than the handrail. Olds testified that the holes were an inch in diameter—large enough for Olds to stick in his little finger.

Shannon also called two District employees, Joseph Hall and Margaret Williams, as witnesses. At the time of the accident, Hall worked as a maintenance mechanic at James

Creek. Hall's duty included daily property inspections, which included frequent inspections of the playground area. Initially, Hall did not remember seeing the holes. Shannon refreshed his memory with his deposition testimony, in which he stated he had seen the holes. Hall repeated that he did not specifically remember seeing the holes, but that he did not think they were dangerous and therefore may have seen them but not noticed them. Williams then testified that she had been property manager at the time of the accident and that her duties included inspecting the property frequently—including the playground—for safety hazards. Williams denied seeing the holes or any other defect in the slide before the accident and further denied ever being informed about them by the maintenance staff.

Shannon also called Paul Hogan as an expert on playground safety. Hogan testified that there were national standards for the maintenance of playgrounds and playground equipment, that these standards required all pipes with open ends to be capped, and that a maintainer of playgrounds had a duty to inspect the playground regularly for hazardous conditions. As proof of these national standards, Hogan cited the Consumer Product Safety Commission (CPSC) Handbook. The District objected, arguing that the CPSC Handbook did not constitute a national standard and that it had not been adopted in the District as the standard of care owed by maintainers of playgrounds. Agreeing with the District, the court ruled that Hogan had failed to show that there was any national or District standard of care specifically directed at playground maintainers at the time of the accident. The court, however, did allow Hogan to testify—as an expert on playground safety—as to whether the open pipe constituted a dangerous condition that a reasonably prudent person, exercising reasonable care, should have known was dangerous.

The court revisited the standard of care later, conducting an extensive voir dire of Hogan away from the jury as to the existence of any standard of manufacture, installation, or maintenance during the relevant time period. After hearing argument from both sides, the court again concluded that Hogan had not established the existence of any specific standard applicable to the District, but that he could testify as an expert on whether a reasonably prudent person would have recognized the holes as a dangerous condition. Hogan then testified that each hole was a defect and that the District had been negligent, since anyone familiar with children would know they have a tendency to stick their fingers in openings and could therefore injure themselves in such a hole. Hogan also attempted to testify that the District should have inspected the slide regularly for just such defects, but the court sustained the District's objection that the testimony was merely Hogan's personal opinion, not a reflection of any industry standard.

At the end of the trial, the court conferred with counsel for both parties on appropriate jury instructions. The District asked the court to submit special interrogatories to the jury regarding the negligence of Miracle and Oaklawn so that the District could establish Miracle's and Oaklawn's liability and—if they were found liable (along with the District)—claim pro rata credits for the settlements of those two parties with Shannon. Shannon objected that the District had not raised the issue in a timely manner and thus had prevented her from arguing to the jury that the District had been solely responsible for the accident. The court, without explaining its reasoning, denied the District's request.

The court instructed the jury as to both the reasonable care standard and the special duty owed to children. *See* Standardized Civil Jury Instructions for the District of Columbia, Nos. 5–1, 5–6, 5–7 (1981). The jury returned a verdict in favor of Shannon for $550,000. After the verdict, the District filed a written motion for judgment notwithstanding the verdict or a new trial, and for a remittitur. The District also requested pro rata credits, equaling a two-thirds reduction, based on the negligence of Miracle and of Oaklawn, respectively. The court denied the motion. The court concluded that Hogan's testimony, while not establishing a standard of care for professional playground operators in the District, was relevant to the general duty to exercise reasonable care and that the

question of reasonable care had been properly submitted to the jury. The court also concluded that the District's failure to file a crossclaim against Miracle or Oaklawn barred the submission of special interrogatories for purposes of establishing pro rata credits for their negligence. This appeal followed.

## II.

On appeal, the District makes four principal arguments: (1) the evidence failed to prove that the District knew about, or had constructive knowledge of, the holes; (2) a reasonable person who noticed the open holes in the siderails would not have recognized that they created a dangerous condition requiring repair; (3) Shannon failed to show that the District had a special duty of care derived from national standards in the CPSC Handbook or elsewhere applicable to operators of housing projects; and (4) the trial court erred by refusing to submit the special interrogatories about Miracle's and Oaklawn's negligence to the jury and, as a consequence, denying the District the opportunity to establish its right to pro rata credits for Miracle's and Oaklawn's settlements with Shannon.

## A.

 On review of the District's motion for judgment notwithstanding the verdict, we will reverse the trial court's denial of the motion only if no reasonable juror could have decided for the plaintiff. *See District of Columbia v. Cooper,* 445 A.2d 652, 655 (D.C. 1982) (en banc). The District's first contention, that the evidence was insufficient for the jury to find that the District had actual or constructive knowledge of the holes, is entirely without merit. Hall and Williams both testified that they conducted regular inspections of the slide, and Hall testified that although he could not remember at the time of trial whether he had seen the holes, he may have seen them and simply ignored them as non-dangerous. Shannon introduced photographic evidence supporting a finding that the holes were open well before the accident. A jury, therefore, reasonably could have inferred that the persons responsible

for inspecting the slide either saw or should have seen the holes.

The District argues that *Croce v. Hall,* 657 A.2d 307 (D.C.1995), prohibits a finding of constructive notice based on a duty to inspect. In *Croce,* we held that a landlord's general duty of reasonable care to all persons lawfully on the premises did not require a landlord to monitor weather reports or to take other, extraordinary means to determine whether a dangerous accumulation of snow and ice had occurred. *See id.* at 310–12. The question whether the District had a duty to inspect the slide, however, is irrelevant because District employees actually did inspect the slide regularly. The question, therefore, is not whether the District had constructive notice based on a duty to inspect but whether the District can be said to have had actual or constructive notice based on an inspection that would have revealed the defect to a reasonable person, exercising reasonable care. *See Pessagno v. Euclid Inv. Co.,* 72 App.D.C. 141, 112 F.2d 577 (1940) (concluding that landlord had received notice of buildup of snow and ice before accident and therefore had duty to exercise reasonable care in safeguarding the building entrance). In this case, because a District employee who inspected the slide testified that he might have seen the holes but failed to recognize them as dangerous, the jury could have found that he did see the holes and that the District accordingly had notice of the defect through its employee. Whether the District should have recognized that defect as a dangerous condition is a separate question, which we take up next.

## B.

The trial court concluded that Hogan failed to establish the existence of a national standard of care for playground maintainers, as distinct from the general duty of reasonable care owed by any property owner to someone lawfully on the property. The trial court then ruled that the general duty applied, and that the jury should decide whether a reasonably prudent person would have recognized that the holes created a dangerous condition in need of repair. To this end, the court permitted Hogan to testify by reference to

the CPSC Handbook as to whether, in his expert opinion, a reasonably prudent person would have recognized the defect.

■ The District argues that expert testimony was required to establish the standard of care, and that Hogan's testimony did not establish a national or any other applicable standard of care supported by relevant factual evidence. The District, therefore, rejects the proposition that the jury, without such expert assistance, could apply the general duty of reasonable care by finding that a public housing playground supervisor could reasonably have been expected to recognize that the holes created a dangerous condition.[1] To the contrary, we agree with the trial court that, on the evidence presented, the question whether a reasonably prudent person would have recognized that the holes created a dangerous condition in need of repair was properly submitted to the jury.

■ As a general rule, a plaintiff in a negligence action must prove " 'the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between that deviation and the plaintiff's injury.' " *Toy v. District of Columbia,* 549 A.2d 1, 6 (D.C.1988) (quoting *Meek v. Shepard,* 484 A.2d 579, 581 (D.C. 1984)). "[T]he question of whether a defendant owes a duty to a plaintiff under a particular set of circumstances is entirely a question of law that must be determined only by the court." *Croce,* 657 A.2d at 310 (internal quotation marks, ellipsis, and brackets omitted). If the appropriate standard of care falls "within the realm of common knowledge and everyday experience," a plaintiff will not need expert testimony to establish a standard and a deviation. *District of Columbia v. White,* 442 A.2d 159, 164 (D.C.1982) (inter-

nal quotation marks omitted). On the other hand, "if the subject in question is so distinctly related to some science, profession, or occupation as to be beyond the ken of the average layperson," expert testimony as to the standard of care will be required. *District of Columbia v. Peters,* 527 A.2d 1269, 1273 (D.C.1987).

■ We agree with the trial court that the facts here presented a situation "within the realm of common knowledge and everyday experience," and could have gone to the jury without expert testimony establishing a special standard of care for maintainers of playgrounds higher than the duty of reasonable care owed by any landlord to someone lawfully on the property. *See Croce,* 657 A.2d at 310 (" 'In the District of Columbia the applicable standard for determining whether an owner or occupier of land has exercised the proper level of care to a person lawfully upon his [or her] premises is reasonable care under all the circumstances.' " (quoting *Sandoe v. Lefta Assocs.,* 559 A.2d 732, 738 (D.C. 1989))).

It is useful to compare this case with our recent decision in *Messina v. District of Columbia,* 663 A.2d 535 (D.C.1995), which also included testimony by Paul Hogan about the CPSC Handbook. In *Messina,* we agreed with the trial court that "a particular cushioning standard for the ground under the monkey bars [in a school playground] to prevent injuries is not a subject within the understanding of the average juror." *Id.* at 538. The present case, however, does not involve anything so esoteric. It takes no expert knowledge of human behavior to know that children stick their fingers in holes. Nor does it take expert knowledge of playground equipment to find that with the hand-

---

**1.** In arguing that Hogan failed to establish a national or other specific standard of care different from the landowner's general duty of reasonable care under the circumstances, the District does not argue, in the alternative, that if the general duty were held to reflect the applicable standard of care, Hogan's expert testimony could not be used in support of it. As the trial judge herself recognized, and the District does not question, the trial court in civil trials has broad discretion to admit expert testimony, even where not required, if it will aid the finder of fact in the search for truth. *See Glorious Food, Inc. v.*

*Georgetown Prospect Place Assocs.,* 648 A.2d 946, 949 (D.C.1994) (holding that although expert testimony would have been useful and plaintiff could have called expert, lay testimony was sufficient); *Columbus Properties, Inc. v. O'Connell,* 644 A.2d 444, 448 (D.C.1994) (same). The District did not move to strike Hogan's testimony, and thus the jury was allowed to consider it in connection with applying the general duty of reasonable care under the circumstances. Nor does the District argue on appeal that the testimony should have been stricken.

rail of a playground slide missing—as Shannon's investigator testified it was, and as the photos introduced in evidence showed—a child would be likely to put his or her hand directly on the siderail within reach of the uncapped hole.

■ As a property owner, the District owed a duty of reasonable care under all the circumstances to persons lawfully in the playground and playing on the slide. *See Croce,* 657 A.2d at 310. Here, where it was not merely foreseeable but actually was expected that young children would use the property, the District owed "such vigilance and caution as is appropriate where the presence of children is foreseen." Standardized Civil Jury Instructions for the District of Columbia, No. 5–6 (1981). The District notes that the hole was small and its edges were smooth, and that no accident involving the holes in the siderails of the slide had occurred since the slide's installation seven years before the accident. The District also points out that Shannon introduced no evidence of a similar accident occurring anywhere else at any time. Given this evidence, the District argues the accident was not foreseeable. While the District was free to argue these facts to the jury—and the District did so— we cannot say as a matter of law that such evidence requires us to conclude that the accident was not reasonably foreseeable. Because the circumstances were not "so distinctly related to some science, profession, or occupation as to be beyond the ken of the average layperson," *Peters,* 527 A.2d at 1273, the jury was capable of resolving the issue. *See Abebe v. Benitez,* 667 A.2d 834, 836 (D.C. 1995) ("Questions of negligence are for the jury, except in the exceptional cases where only one reasonable inference can be drawn from the evidence.... If conflicting inferences can be derived from the evidence, a trial court should allow the case to go to the jury."); *Cooper,* 445 A.2d at 655. Accordingly, we conclude that the trial court did not err in denying the District's motion for judgment notwithstanding the verdict. We sustain the jury's verdict.

**III.**

We turn now to the question whether the trial court erred in denying the District's request for special interrogatories concerning the negligence of Oaklawn and Miracle. Shannon settled with Miracle and Oaklawn before trial, and no witnesses from those former defendants were called by anyone to testify at trial. The District argues, however, that for purposes of obtaining credits for the settlements against the verdict, the District should have been allowed to argue inferences from the evidence presented that Miracle and Oaklawn, as manufacturer and installer, respectively, were jointly responsible for the child's injuries, and that the jury should have resolved the settling parties' negligence by answering special interrogatories addressed to that issue. We may be skeptical that the evidence at trial could have established the manufacturer and installer as joint tortfeasors, but Shannon does not make that argument here. Accordingly, we consider the question as though the District might have been able to prove its case.

■ In *Martello v. Hawley,* 112 U.S.App.D.C. 129, 300 F.2d 721 (1962), the United States Court of Appeals for the District of Columbia Circuit held, in an opinion binding on us,[2] that where a plaintiff settles with one joint tortfeasor whose liability is judicially established, a nonsettling tortfeasor is entitled to a pro rata reduction of a jury verdict for the plaintiff. *See id.* at 132, 300 F.2d at 724. The court reasoned that, because the remaining defendants could have sought contribution from the settling defendant had the settlor remained in the case, no remaining defendant should be forced to pay more than it otherwise would have paid if the settling defendant had not settled. *See id.* at 131, 300 F.2d at 723. In this case, therefore, where two of three defendants settled, the District would be entitled under *Martello* to a two-thirds reduction ($366,666.67) of the jury verdict, paying Shannon one-third ($183,333.33) as its pro rata share of the jury's assessment of total liability ($550,000). If the District is not entitled to a pro rata credit, it will be entitled to a pro tanto credit against the verdict, meaning a credit for the

2. *See M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C. 1971).

actual amount of the settlements of Miracle and Oaklawn combined ($100,000), before assessing the District's total liability ($450,000). *See Snowden v. D.C. Transit Sys., Inc.*, 147 U.S.App.D.C. 204, 206, 454 F.2d 1047, 1049 (1971). For a defendant to receive a pro rata *Martello* credit, rather than a pro tanto *Snowden* credit, however, the liability of the settling defendants must be established either by adjudication, *see Washington v. Washington Hosp. Ctr.*, 579 A.2d 177, 189 (D.C.1990), or by stipulation between the plaintiff and the settling defendant, *see Berg v. Footer*, 673 A.2d 1244, 1251 (D.C.1996).

 Although the question whether, on a particular set of established facts, a defendant shall receive a pro rata or a pro tanto credit is a question of law which this court reviews de novo, *see id.* at 1247, the initial question whether to submit interrogatories bearing on that issue to the jury is committed to the discretion of the trial court. *See Zaiko v. District of Columbia*, 138 U.S.App.D.C. 336, 339, 427 F.2d 606, 609 (1970). While the trial judge at first did not explain her reasons for denying the requested interrogatories, she ultimately explained in her post-trial order that the District's failure to crossclaim against the settling defendant barred the District from claiming a pro rata credit. We must accept this explicit reason as the basis for the trial court's decision.

 In *Washington*, we suggested that a defendant need not have filed a crossclaim against the settling defendant to preserve the right to a pro rata credit as long as the jury determines the liability of the settling party. *See Washington*, 579 A.2d at 188; *see also Berg*, 673 A.2d at 1251 n. 14. We continue to agree that—provided a plaintiff has adequate notice—a special interrogatory requesting the jury to determine the liability of a settling defendant will suffice to preserve a nonsettling defendant's pro rata credit for the settler's imputed share of the jury's assessment of total liability.[3] Accordingly, we must conclude that the trial court erred in

ruling that the absence of a crossclaim automatically barred the District from asserting its right to a *Martello* credit.

 Although we may affirm a trial court's exercise of discretion when the trial court has provided no explanation, *see In re Moses*, 659 A.2d 829, 831 (D.C.1995), we ordinarily must reverse an otherwise sustainable exercise of discretion if the trial court's ruling is manifestly based on "erroneous legal thinking." *Wright v. United States*, 508 A.2d 915, 919 (D.C.1986). We may, nonetheless, affirm if, on the record, the trial court would have had "but one option." *Id.* at 920 (internal quotation marks omitted). We see but one option here. As elaborated below, we conclude the trial would have abused its discretion had it granted the District's request for special interrogatories.

 In *Washington*, where we denied a pro rata credit to a defendant who had not raised the *Martello* issue until after trial, we stressed the importance of the plaintiff's having adequate notice that the defendant would seek pro rata credit for each settling defendant:

> Whether the settlement occurs before trial or during it, a plaintiff facing possible application of a *Martello* credit should have fair notice that the nonsettling defendant plans to seek a *pro rata* reduction of the verdict on the ground that his settling counterparts were negligent, and an opportunity to build a rebuttal case.

*Washington*, 579 A.2d at 188. We acknowledged that the nonsettling defendant's opportunity to seek a pro rata credit could produce a result where the plaintiff, after asserting the liability of the settling defendant throughout the course of the litigation, suddenly does an about face to lay the blame entirely on the nonsettling defendant, *see id.*; but we explicitly rejected the idea that plaintiffs were bound by their pretrial pleadings, *see id.* at 189. We said that the *Martello* rule, allowing plaintiffs to argue that their pleadings alleging the settling defendant's

---

**3.** In *Washington*, relying on *Washington Healthcare Corp. v. Barrow*, 531 A.2d 226, 230 (D.C. 1987), this court also suggested that a trial court could award a pro rata credit where the record

establishes the settling defendant's liability as a matter of law. *See Washington*, 579 A.2d at 188–89. The District does not press such a claim here.

liability had been wrong, was justified by the fact that the defendant, rather than the plaintiff, usually has control over the timing of a settlement and can make that decision after seeing the strength of the plaintiff's case. *See id.* at 188. It therefore would be unfair, we said, to penalize a plaintiff when the timing of the settlement had forced the plaintiff to take a position at trial contrary to plaintiff's pleadings, since this timing effectively was beyond the plaintiff's control. *See id.* We also noted that in previous cases we had viewed a defendant's claim to a pro rata credit more favorably when the defendant swiftly asserted this right through a cross-claim or, if the settlement occurred during trial, through a prompt request for special interrogatories, rather than waiting until the last possible moment. *See id.* at 186–88. We concluded, accordingly, that a plaintiff not only must receive the earliest possible notice of a defendant's intent to claim a pro rata credit but also must have an opportunity to develop the record in opposition to the claim. *See id.* at 188.

The District says that, despite its failure to mention a pro rata credit before trial, Shannon had ample notice that the District intended to make Miracle's and Oaklawn's negligence an issue, and thus had sufficient opportunity to make her record in opposition to the District's pro rata claim. More specifically, the District maintains that, because it asserted in its answer that Hughes' injury had been caused by "the acts or omissions of third parties not under the employ of the District," and had reiterated this defense in an addendum to the joint pretrial statement

after Miracle and Oaklawn had settled, Shannon had to assume that the District not only would seek to escape liability but also would attempt to limit that liability with a *Martello* credit. The District also asserts that it raised the issue at the beginning of trial, providing Shannon with notice sufficient to allow her to establish a record defending Miracle and Oaklawn.[4]

Shannon counters that the District's cursory raising of the *Martello* issue in response to her own motion, without making any request for interrogatories until the end of trial—and in no other way focusing the court's attention on the issue—did not provide adequate notice. Because the trial court did not indicate whether it agreed with the District's position or with Shannon's on the *Martello* question, see *supra* note 4, Shannon argues that she had no way of knowing that she needed to establish a record as to Miracle and Oaklawn. As a consequence, says Shannon, the District's notice on the first day of trial was completely inadequate.

Furthermore, according to Shannon, even if the District did properly raise the issue on the first day of trial, that was too late. The consent order approving the settlements was issued on January 5, 1994, approximately one month before the pretrial order was issued and four months before trial. The District therefore could have, but did not, raise the issue in the addendum to its pretrial statement filed the same day, January 5, or at any time between the approval of the settlements on January 5 and issuance of the pretrial order on February 1, 1995. Because the

---

4. At the beginning of trial, Shannon filed a motion in limine "to prevent the District of Columbia from attempting to escape liability in this case by attempting to show that the parties that were dismissed … were the negligent parties." The District objected, arguing that the District had asserted this defense and that it had the right to "either escape or at least limit its liability" by proving the negligence of Miracle and Oaklawn. As part of this colloquy, the District cited *Martello* and *Snowden,* concluding that "we're able to limit our liability that way, if not escape it completely." Shannon responded:

The *Washington Hospital Center* case [*Lamphier v. Washington Hosp. Ctr.,* 524 A.2d 729 (D.C. 1987)] that counsel cited, if the court reads that carefully, the court will note that the basis of that case is notice. When we're talking

about the type of credit that the District is entitled to, the basis of the case is notice to the adverse party…. The plaintiff is not in a position to defend the manufacturer, nor defend the installer, and that's the basic premise of the *Washington Hospital Center* case, there has to be prior notice.

The court then proceeded to discuss the District's primary defense of proximate cause and the District's right to escape liability completely by demonstrating that the accident occurred solely as a result of negligence on the part of Miracle or Oaklawn. No one mentioned *Martello* or *Snowden* again until the end of trial, when the District—for the first time—asked for interrogatories to establish Miracle's and Oaklawn's liability, and Shannon again objected on lack-of-notice grounds.

District knew for nearly a month before the order—and nearly four months before trial—that it could raise the *Martello* issue, but did not, the District cannot raise it at trial. *See District of Columbia v. Sterling,* 578 A.2d 1163, 1166 (D.C.1990). Shannon points out that the pretrial statement explicitly asked for a set-off for any medical treatment or other services the District provided in relation to the accident but did not mention a pro rata credit for imputed contribution by settling joint tortfeasors. This pretrial statement was incorporated by reference into a pretrial order, which contained the following language:

> The claims and defenses of the parties are set forth in the parties' respective Pretrial Statements *and no other claims or defenses will be entertained at trial* absent exceptionally good cause. *All claims and defenses asserted with regard to Oaklawn Development Corporation and Miracle Recreation Equipment will not be asserted by either party* by virtue of a settlement and dismissal as to each party Defendant occurring on January 5, 1994.

(Emphasis added.) This language, Shannon argues, foreclosed the District from raising the *Martello* credit issue at trial. *See generally Taylor v. Washington Hosp. Ctr.,* 407 A.2d 585, 591–93 (D.C.1979) (discussing nature of pretrial order); Super. Ct. Civ. R. 16(g).

■ We agree with Shannon that the District did not properly raise the issue in its pretrial statement simply by invoking, as a general defense, the unspecified negligence of third parties. We also agree that, even if the District properly raised the *Martello* issue on the first day of trial, that notice came too late to satisfy the requirements of *Wash-* *ington.* To allow a defendant to delay raising the issue of a *Martello* credit—for a settlement that occurred well before trial—until the trial actually begins would prevent plaintiffs from conducting any meaningful discovery on the issue or preparing a defense. *See Sterling,* 578 A.2d at 1167; *Washington,* 579 A.2d at 188.

■ Accordingly, when a settlement occurs before the pretrial order, *Washington's* notice requirement should be understood to indicate that the claim for a *Martello* credit should be contained in that order; and when the settlement occurs between the pretrial order and trial, the nonsettling defendant should announce the decision to seek such a credit as soon as practicable after the settlement, preferably—for clarity—by asking to amend the pretrial order. *Cf. Daniels v. Beeks,* 532 A.2d 125, 128–29 (D.C.1987) (holding that plaintiff should have been permitted to amend pretrial statement in light of later developments where plaintiff promptly sought leave to amend and time remained for defendant to conduct discovery).

■ Similarly, we cannot accept that the District's merely advancing the argument that another party's negligence relieves the District from liability is enough, by itself, to raise the specific issue of a pro rata credit. *Cf. Adams v. A.B. & A., Inc.,* 613 A.2d 858, 860–61 (D.C.1992) (holding that general reference in pretrial statement to consumer protection statute and specific provision within it providing for attorney's fees did not permit plaintiff to raise for first time at trial previously unmentioned causes of action available under statute).[5] The District, moreover, failed to claim in its pretrial state-

---

5. Unless the District could show that the two other parties, Miracle and Oaklawn, were *entirely* responsible for the injury, Shannon would only have to show that the District was partly responsible in order to hold the District liable for the whole. Thus, unless Shannon were put on notice that the District would seek a *Martello* credit, Shannon would not have to shift gears and attempt to lay the blame *entirely* on the District, in order to avoid a prejudicial, pro rata credit (in the event the jury verdict exceeded 150% of the total amount of the settlements).

Because a nonsettling defendant is always entitled at least to a *Snowden,* pro tanto credit when there is a settling joint tortfeasor, the prejudice to the plaintiff from a *Martello,* pro rata credit will vary depending on the number of settling joint tortfeasors. If, for example, there are but two joint tortfeasors and one settles while the other does not, the plaintiff will lose from a *Martello* credit only when the jury verdict exceeds 200% of the amount of the settlement. If there are five joint tortfeasors, four of whom settle, the *Martello* credit becomes prejudicial when the jury verdict exceeds 125% of the combined settlements.

ment a pro rata credit as a specific set off, despite requesting a set off for any treatment it already had provided Hughes or Shannon as a result of the accident. Furthermore, although the District's failure to make a crossclaim is not dispositive, we note that both Miracle and Oaklawn filed crossclaims against the District. The District failed to respond in kind by raising the *Martello* issue through a corresponding crossclaim, as well as to assert a right to a pro rata credit either as a defense or as a set off. These omissions, when combined with the statement of the pretrial order that no defenses other than those specifically asserted in the pretrial statement "[would] be entertained at trial," and that defenses "asserted with regard to [Miracle and Oaklawn] will not be asserted by either party," could (and apparently did) reasonably lead Shannon to believe that the District's reference to the negligence of third parties was an attempt to escape liability completely, either through a claim that Miracle and Oaklawn alone were responsible for Hughes' injury or that some intervening cause had removed the caps and caused the holes. *See Adams,* 613 A.2d at 860 ("This scattershot approach at pretrial, where only one provision of a statute is specified and the rest of the statute in general is mentioned, without any focus on what the pleader expects the opponent to defend under the balance of the statute, will simply not do."). Because "a *pro rata* credit [is] a substitute for the non-settling defendant's actual claim for contribution that persists after the dismissal of the principal claim against a settling defendant—and not simply ... an incident of the existence of an abstract right to contribution never asserted," *Washington,* 579 A.2d at 187 (emphasis omitted)—there is no reason for a plaintiff to assume that a pro rata credit is at issue in the absence of an explicit claim to that credit by the nonsettling defendant.

In sum, the District's raising of the issue—out of an apparently clear blue sky—on the first day of trial simply cannot substitute for adequate notification in the pretrial order when such notice could have been provided there. In *Sterling,* a District prisoner sued the District for damages resulting from an assault by other prisoners. *See Sterling,* 578 A.2d at 1164. During a discussion of preliminary matters on the first day of trial, the District announced an intent to rely on Sterling's failure to notify the prison authorities of certain threats made against him—a failure suggesting either assumption of the risk of an attack or contributory negligence. *See id.* at 1165. The trial court refused to allow the District to proceed with these defenses. *See id.* at 1166. We agreed with the trial court that the District's failure to raise the issue before trial had prevented Sterling from engaging in meaningful discovery on the issue and preparing a defense, *see id.,* and that "to let this issue unravel before this jury would serve only to confuse the jury and to threaten a fair trial," *id.* (internal quotation marks omitted). Similarly, in *Taylor,* we held that the trial court properly denied the plaintiff's request—made on the morning of the first day of trial—to amend the pretrial order to include new allegations of negligence. *See Taylor,* 407 A.2d at 589–93. The same considerations apply here.

 The pretrial order, of course, is not binding in the event that the settlement occurs after the order is issued. *See Daniels,* 532 A.2d at 127–29 (discussing factors to be weighed by trial court on motion to amend pretrial order); *see also Sanchez v. Eleven Fourteen, Inc.,* 623 A.2d 1179, 1180 n. 1 (D.C.1993) (finding no abuse of discretion in admission of evidence not mentioned in pretrial statement when there was no prejudice to nonoffering party). However, once it becomes clear to a defendant that a codefendant's alleged negligence will not otherwise go to the jury, we see no reason why a defendant should not have to " 'safeguard any legitimate claim it might have to lessen the burden of a plaintiff's verdict' " with a pro rata credit, in a swift and diligent fashion. *Washington,* 579 A.2d at 188 (quoting *Hall v. General Motors Corp.,* 207 U.S.App.D.C. 350, 359, 647 F.2d 175, 184 (1980)). We would expect, therefore, that a defendant usually will have to assert a right to a pro rata credit either through the traditional means of a crossclaim for contribution, or by asserting it explicitly as a defense or set off in the pretrial order, or as a request for special inter-

rogatories to the jury as soon as a settlement occurs during trial.[6]

\* \* \* \* \* \*

We conclude that expert testimony was not required to establish the standard of care and that the trial court, therefore, did not err in permitting this case to go to the jury on a theory of ordinary care. Further, we conclude that the District did not raise the issue of pro rata credits for Oaklawn's and Miracle's settlements with Shannon in time to gain the benefit of such credits against the jury's verdict, and that the trial court, therefore, did not err in denying the District's request for special interrogatories on the liability of the settling codefendants, Miracle and Oaklawn.

*Affirmed.*

---

6. We note that, even if the defendant does not raise the issue, a defendant is still entitled to a pro tanto (*Snowden*) credit. *See Berg,* 673 A.2d at 1250 n. 10; *Washington,* 579 A.2d at 186. The record here does not reflect whether the trial court applied a pro tanto credit and awarded the District a set off of $100,000 based on Shannon's settlements with Miracle and Oaklawn.